1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| TRAVIS RAY THOMPSON,<br><br>                              Petitioner,<br><br>        vs.<br><br>JEANNE WOODFORD, Warden, et al.,<br><br>                              Respondents. | Civil No.    06cv1758-JAH (NLS)<br><br>**REPORT AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE RE DENIAL OF PETITION FOR WRIT OF HABEAS CORPUS** |

This Report and Recommendation is submitted to United States District Judge John A. Houston pursuant to 28 U.S.C. § 636(b)(1) and Local Civil Rule HC.2 of the United States District Court for the Southern District of California.

## I.

## FEDERAL PROCEEDINGS

On August 28, 2006, Travis Ray Thompson (hereinafter "Petitioner"), a state prisoner proceeding pro se and in forma pauperis, filed a Petition for Writ of Habeas Corpus by a Person in State Custody pursuant to 28 U.S.C. § 2254.  (Doc. No. 1.)  Petitioner claims his federal constitutional rights were violated because: (1) he received ineffective assistance of appellate counsel; (2) the trial court improperly revoked his self-representation status; (3) the trial court interfered with his ability to present a defense by restricting and disparaging his evidence; and

(4) due to jury misconduct.  (Pet. at 6-10.)  Petitioner has also filed two Notices of Lodgment. (Doc. Nos. 5, 13.)  Respondent Jeanne Woodford (hereinafter "Respondent") has filed an Answer to the Petition, accompanied by a Memorandum of Points and Authorities in support, and has lodged portions of the state court record.  (Doc. No. 6.)  Respondent contends Petitioner is not entitled to habeas relief because the state court's denial of his claims was neither contrary to, nor involved an unreasonable application of, clearly established federal law.  (Memorandum of Points and Authorities in Support of Answer ["Ans. Mem."] at 7-22.)  Following an enlargement of time, Petitioner filed a Traverse.  (Doc. No. 14.)

## II.

## STATE PROCEEDINGS

In a one-count Information filed in the Imperial County Superior Court on January 5, 2004, Petitioner was charged with assault with a deadly weapon by means likely to produce great bodily injury in violation of Cal. Penal Code section 245(A)(1).  (Lodgment No. 1, Clerk's Tr. at 7.)  The Information further alleged that Petitioner had personally used a deadly weapon, and had suffered two prior felony convictions.  (Id. at 8-9.)  On June 4, 2004, a jury found Petitioner guilty of assault with a deadly weapon, and returned a true finding on the allegation that he had personally used a deadly weapon during the commission of the offense.  (Id. at 515-16.)  In a bifurcated bench trial, the trial court found true the allegation that Petitioner had suffered two prior serious felony convictions.  (Id. at 521.)  Petitioner was sentenced to thirty years to life in state prison.  (Lodgment No. 5, People v. Thompson, No. D044829, slip op. at 18 (Cal.Ct.App. Aug 12, 2005).)

Petitioner appealed his conviction to the California Court of Appeal, Fourth Appellate District, Division One, raising, inter alia, the same claims presented in his federal habeas Petition here, with the exception of the ineffective assistance of counsel claim.  (Lodgment Nos. 2-4.)  Petitioner filed a habeas petition in the appellate court raising, inter alia, the ineffective assistance of counsel claim presented here.  (Lodgment No. 6.)  His conviction was affirmed in an unpublished opinion.  (Lodgment No. 5.)  The habeas petition was denied in a separate order. (Lodgment No. 7.)  Petitioner thereafter filed a petition for review of the appellate court opinion

affirming his conviction. (Lodgment No. 8.) That petition was denied by an order which stated in full: "Petition for review DENIED." (Lodgment No. 9, <u>People v. Thompson</u>, No. S137191, slip op. (Cal. Nov. 22, 2005).) He filed a separate petition for review of the appellate court order denying his habeas petition. (Lodgment No. 13.) That petition was denied by an order which stated in full: "Petition for review DENIED." (Lodgment No. 15, <u>In re Thompson</u>, No. S144233 (Cal. June 26, 2006).)

### III.

### UNDERLYING FACTS

Ruben Ramos, an Imperial County Sheriff's Department Correctional Officer, testified that he was on duty November 1, 2003, at the Regional Adult Detention Facility in El Centro, California, which is a branch of the Imperial County Jail. (Lodgment No. 16, Reporter's Tr. at 1208-10.) At about 10:00 a.m. that day, Ramos was escorting inmate Cooper from the shower on the first floor of the Bravo Module back to cell number three on the second floor, where Cooper was housed. (<u>Id.</u> at 1210, 1235.) The Bravo Module is an administrative segregation unit housing inmates who are highly prone to escape and/or assaultive toward staff or other inmates. (<u>Id.</u> at 1235.) There are five cells on the second floor with one inmate per cell; Petitioner was housed in cell number four. (<u>Id.</u> at 1211.) Cooper requested to be moved from cell three to cell two, so Ramos received permission from Sergeant Figuroa to rehouse Cooper, directed Officer Tabarez to open cell three, told Cooper to gather his belongings, and then signaled Tabarez to open cell two. (<u>Id.</u> at 1213-15.)

The door to cell two never opened, and instead Ramos heard Tabarez yell down to him: "Close that cell door." (<u>Id.</u> at 1215.) Unsure which cell Tabarez was referring to, Ramos instinctively reacted by walking toward cell four, Petitioner's cell. (<u>Id.</u> at 1215-16.) As Ramos approached cell four, the door was pushed open, and Petitioner rushed out of the cell and pushed Ramos to the floor. (<u>Id.</u> at 1216-17.) When Ramos got up he saw Petitioner in Cooper's cell making slashing-type motions at Cooper. (<u>Id.</u> at 1217-18.) Cooper was handcuffed and holding his hands in front of him trying to block his face and body. (<u>Id.</u> at 1219.) Ramos gave a command for both inmates to stop, and repeated the command several times but neither

complied.  (Id. at 1220.)  He sprayed pepper spray into the eyes of both inmates but it had no effect.  (Id. at 1220-21.)  Ramos was joined by Tabarez as they entered the cell and pulled Cooper out; he was bleeding from his chest, stomach and forearm and was very bloody.  (Id. at 1222.)  Ramos escorted Cooper to the medical department while several other correctional officers responded to the altercation.  (Id. at 1223.)  Ramos later searched Cooper's cell with Tabarez and Officer Valdez; on the floor of the cell Tabarez found the razor portion of a disposable shaving razor with blood on it and tape on its tip.  (Id. at 1224-25.)  Ramos saw Petitioner make twenty to thirty slashing motions at Cooper in all, and observed blood on the floor and walls of Cooper's cell.  (Id. at 1218, 1225.)

Rodrigo Valdez, an Imperial County Sheriff's Department Correctional Officer, testified that he was on duty at the Regional Adult Detention Facility on November 1, 2003, and that he responded to a panic alarm sounded mid-morning in the Bravo Module.  (Id. at 1255.)  When Valdez arrived at the Bravo Module he saw Officer Ramos escorting inmate Cooper down the stairs; Valdez then ran upstairs where he saw Officer Tabarez on top of Petitioner.  (Id. at 1256.)  Valdez and Tabarez handcuffed Petitioner, escorted him to a holding cell to be examined by medical staff, and searched the cell where the altercation took place.  (Id. at 1257.)  A few feet inside the cell door Valdez found a razor blade taken from a shaving razor issued at the facility, which had been removed from its plastic hardware and wrapped with tape allowing it to be held safely.  (Id. at 1257-58.)

Isaac Tabarez, a Correctional Officer employed at the Imperial County Jail, testified that he was working at the Regional Adult Detention Facility on November 1, 2003, standing just outside the Bravo Module near the control panel which opens the cell doors.  (Id. at 1269-71.)  Officer Ramos called out to open cells two and three to rehouse inmate Cooper.  (Id. at 1272-73.)  Tabarez opened cell three, and then accidentally opened cell four instead of cell two.  (Id. at 1273.)  When Tabarez noticed he had opened cell four, he yelled at Ramos to close the door.  (Id. at 1274.)  Ramos acknowledged the command and walked toward cell four.  (Id. at 1275.)  Petitioner ran out of cell four, pushed Ramos down and entered cell three.  (Id.)  Tabarez pushed his panic alarm and ran into the module.  (Id. at 1277.)  When he reached cell three, Ramos had

pepper-sprayed Petitioner and Cooper, who were fighting. (Id. at 1278.) Petitioner was moving his fists and punching Cooper while Cooper was handcuffed and trying to protect himself. (Id.) Ramos removed Cooper, and Tabarez entered the cell and placed a body lock on Petitioner; Office Valdez helped Tabarez handcuff Petitioner. (Id. at 1279.) When Tabarez and Valdez later searched the cell, Valdez found a razor. (Id. at 1280.)

The jury was shown photographs taken at the hospital emergency room of Cooper's wounds. (Id. at 1302.) Cooper received wounds to his left arm, neck, chest and abdomen. (Id. at 1302-08.) The People rested. (Id. at 1498.)

Petitioner, representing himself with the aid of standby counsel, called Santa Figueroa, a Classification Sergeant with the Imperial County Sheriff's Department, who testified that it is his job to review the background of inmates in order to determine their appropriate placement in the segregation modules at the Regional Adult Detention Facility. (Id. at 1456-57.) Figueroa was working as the Watch Commander on November 1, 2003, and responded to the medical ward after being informed of an altercation between inmates. (Id. at 1458-59.) While Cooper was receiving medical treatment, Figueroa asked Cooper what happened. (Id. at 1459.) Cooper told him that as he was being rehoused an officer opened the wrong door and Petitioner ran out and attacked him. (Id.) Figueroa then interviewed Tabarez, who said that he had opened the wrong door by mistake, that Petitioner ran out and attacked Cooper, and that they found the weapon used, a razor. (Id. at 1460-61.) Figueroa testified that there had been a fight between a Black and an Hispanic inmate in the Bravo Module the day before Petitioner's incident, and that one additional Black/Hispanic assault had taken place within the previous few days. (Id. at 1466, 1475.) Inmate Walker assaulted inmate Salazar in one of those incidents, and inmate Gastelum assaulted inmate Walker in the other. (Id. at 1476.)

Randall Covin, a Recreational Officer with the Imperial County Sheriff's Department, testified that in his seven years with the Department there has always been a conflict between Black and Hispanic inmates at the main jail. (Id. at 1502.) About eighty percent of the inmates at the jail are Hispanic, and Covin stated that in his opinion many of the Black prisoners who are housed in the Bravo Module are not treated fairly by the jail administration or the guards because

they are such a minority.  (Id. at 1512.)  Covin said that inmates in the Bravo Module are usually held there temporarily while they were awaiting trial for offenses committed while in prison, and that the tension between Black and Hispanic inmates on the Bravo Module had been going on "for a while" but had just escalated around the time Petitioner arrived.  (Id. at 1512, 1516.) Covin said it is unusual for Black and Hispanic inmates to be together on the recreation yard, and the April 25, 2002, assault on Petitioner, who is Black, by inmate Serrato, who is Hispanic, was caused when Serrato was released onto the yard with Petitioner; Covin said he "felt it was wrong" for the guards to have placed them on the yard together on that occasion.  (Id. at 1503-07, 1519-20, 1524.)  Covin had warned Petitioner and the other Black inmates prior to the Walker assault that there was an "attack a Black" rumor going around the jail that Black inmates may be assaulted by Hispanic inmates.  (Id. at 1520-21, 1533-34.)  Covin also testified that the majority of Hispanic inmates at the Imperial County Jail are from Southern California, that to the extent they belong to or associate with gangs, they belong to or associate with the Southern Hispanic prison gang, and that inmate Cooper associated with the Southern Hispanic gang.  (Id. at 1526-27, 1533-34.)

Kamaron Lamont Walker testified that he was an inmate housed in the Alpha Module at the Imperial County Jail on November 1, 2003.  (Id. at 1537.)  Walker knew inmate Cooper because they had been at Calipatria State Prison together, and Walker, who is Black, was moved to the Alpha Module from the Bravo Module about two weeks after Cooper came to the Bravo Module due to incidents between Black and Hispanic inmates.  (Id. at 1537-38.)  Walker said that while he was housed in the Bravo Module he was attacked twice by Hispanic inmates, and that he had attacked an Hispanic inmate once.  (Id. at 1539.)  The first assault happened when Walker was being escorted back from a court appearance and a guard opened an Hispanic inmate's cell door and the inmate rushed Walker.  (Id. at 1539-40.)  The jury was shown a portion of a video of that incident.  (Id. at 1550-51.)  After that assault, and just prior to Walker being removed from the Bravo Module, Walker was giving water to an Hispanic inmate through the food port on October 28, 2003, when the Hispanic inmate slashed Walker's arm with a razor. (Id. at 1540-42.)  Walker ran to Petitioner's cell after being cut and Petitioner wrapped Walker's

arm in a wet towel just before he was taken for medical treatment.  (Id. at 1541.)  Walker testified that the Black inmates involved in assaults at the jail were treated unfairly because they were charged with misconduct but the Hispanic inmates were not.  (Id. at 1544-45.)  He also stated that both of the assaults on him were by Southern Hispanic gang members, and that inmate Cooper is a member of that gang.  (Id. at 1552-53.)

On cross-examination the prosecutor elicited from Walker that he had "taken a deal" and pled guilty to felony assault on a correctional officer.  (Id. at 1554.)  On re-direct, Walker stated that the conviction arose from an incident where he assaulted an Hispanic inmate in retaliation for being assaulted by an Hispanic inmate.  (Id. at 1555.)  Petitioner then asked Walker how he had come to be charged with assaulting a correctional officer, but the judge sustained the prosecution's objection to that line of questioning, ruling that the conviction was admissible for impeachment purposes only.  (Id. at 1557.)  In response to Petitioner's continued questioning along that line (id. at 1557-58), the following exchange took place:

The Court:   I'm ruling: No more on that.  We are going to move along.  We are wasting valuable time.

Petitioner:   Mr. Walker, you indicated that the main reason that you had took that deal – what was the reason –

Prosecutor:   Objection.  That's beyond the scope.

The Court:   I'm not going to allow you to ask anymore questions on that.  [¶]  If you insist on doing that, if you insist on disobeying my rulings, I'll have to take some action to bring in your standby counsel and to replace you.

Petitioner:   Then that's what you [are] going to have to do, Your Honor.  That's what you [are] going to have to do.

The Court:   I'm sorry, what?

Petitioner:   Then that's what you [are] going to have to do, Your Honor.

The Court:   Mr. Yturralde [standby counsel], come on up.  [¶]  All right, you are now going to be the primary attorney for the defense.

Mr. Yturralde:         No further questions, Your Honor.

(Id. at 1558-59.)

A hearing was immediately held outside the presence of the jury where the trial judge stated that his reasons for revoking Petitioner's pro per status was his repeated failure to follow

the judge's rulings and continuing of a line of questioning which the judge had ruled was cumulative and irrelevant. (Id. at 1559-60.) It was Friday afternoon, and the trial was continued until the following Wednesday afternoon in order to allow standby counsel to prepare. (Id. at 1562.) Upon reconvening, defense counsel made a motion for mistrial on the basis that Petitioner had failed to adequately prepare for trial and had prejudiced himself by the manner in which he had conducted his defense. (Id. at 1704-07.) The motion was denied, as was a motion for a continuance in order to conduct additional discovery. (Id. at 1707.)

Petitioner testified on his own behalf. He said that he is the second oldest of nine siblings, that he completed the eleventh grade and received his GED while in prison, and that he had been incarcerated since 1995. (Id. at 1710-13.) He stated that he has been a member of the East Coast Crips gang since birth, as are all his family members, and that he continued his gang association while in prison. (Id. at 1712.) He said there is a code of behavior for inmate gang members in prisons and jails which is based on respect, and inmates are sometimes directed to carry out assaults on rival gang members and have a duty to commit retaliatory assaults. (Id. at 1714-19.) Black inmates are at a serious disadvantage to Hispanic inmates at the Imperial County Jail, both because they are outnumbered and because there are few Black guards. (Id. at 1720-21.) The guards at the jail treat Black inmates unfairly by cutting the telephone off on Black inmates without notice, and allowing less than the scheduled hour in the dayroom for Black inmates, whereas Hispanic inmates were often allowed to spend several hours in the dayroom. (Id. at 1725.)

Petitioner testified that soon after he arrived at the Imperial County Jail on February 4, 2002, Officer Covin told him to "watch out" because the guards would try to intimidate and provoke him. (Id. at 1719-20, 1728.) Petitioner was attacked by an Hispanic inmate on April 25, 2002, the first time he was placed on the yard with an Hispanic; up until then he had always been on the yard alone. (Id. at 1729-30.) He was attacked from behind on that occasion as he was walking out to the yard and the guards released the inmate behind him. (Id. at 1731-32.)

In the days preceding Petitioner's November 1, 2003 assault on Cooper, Petitioner witnessed three assaults involving Walker. The first was the October 28, 2003, incident when

Walker was cut by an inmate while giving the inmate water, and although Petitioner did not see the assault, he assisted Walker in stopping the bleeding from his injuries immediately afterwards. (Id. at 1733-34.)  Walker, who was the only Black inmate on the Bravo Module other than Petitioner at the time, told Petitioner that he had been stabbed by a member of the Southern Hispanic prison gang.  (Id. at 1735.)  The second assault involving Walker which Petitioner witnessed took place when Walker was in the dayroom and an Hispanic inmate returning from court was in the hallway waiting for Walker to be placed in his cell, as only one inmate at a time is allowed in the dayroom.  (Id. at 1737-38.)  As the guards opened the door leading into the dayroom of the Bravo Module, Walker ran out and assaulted the Hispanic inmate in retaliation for the prior assault on Walker.  (Id. at 1738.)  The third incident involving Walker took place on October 31, 2003; the guards had handcuffed Walker and were escorting him down the stairs when they opened the door of a cell in the lower level of the Bravo Module, which allowed an Hispanic inmate to run out and assault Walker.  (Id. at 1739-40.)

Petitioner stated that he believed he was going to be the subject of an assault by an Hispanic inmate based on his conversations with Officer Covin, who told him there would be an assault on a Black inmate, and due to the prior assaults on Walker.  (Id. at 1742-43.) Petitioner knew that due to the high level of security in the Bravo Module the only way he could be attacked was if the guards provided the opportunity for an Hispanic inmate to do so, as they had for the previous assaults between Black and Hispanic inmates.  (Id. at 1744-45.)  Petitioner said that he had armed himself with a razor in anticipation of the guards providing an Hispanic inmate an opportunity to attack him, although he actually anticipated that such an attack would happen when he was shackled, unarmed and unable to defend himself.  (Id. at 1747.)

Petitioner spoke to inmate Cooper earlier in the day of the incident, and noticed he had a state-issued shaving razor in his shorts.  (Id. at 1757.)  Cooper was unusually withdrawn and edgy that day.  (Id. at 1748.)  Petitioner was preparing his shower materials when the guards brought Cooper back to the module from the shower.  (Id. at 1759.)  He felt something was going to happen and was watching the panel which controlled the cell doors.  (Id.)  When Petitioner's cell door opened he thought that Cooper was coming to attack him and that the

guards had set it up.  (Id. at 1760.)  When his cell door opened Petitioner grabbed his razor, and when Officer Ramos came towards his cell, Petitioner pushed his cell door open; Ramos fell down attempting to close the door, and Petitioner ran into Cooper's cell.  (Id. at 1761-63.) Petitioner thought Cooper was playing possum and wanted Petitioner to go into his cell to avoid the cameras.  (Id. at 1763.)  Petitioner initiated the assault because he believed that sooner or later that day the guards would set up an assault on him when he was unable to defend himself, and because he thought the guards were conspiring to have him murdered.  (Id. at 1764, 1768.) Petitioner said he was acting in self-defense, and that he swung his razor at Cooper only three or four times while Cooper was near the toilet where he might have retrieved a razor of his own. (Id. at 1765-69.)  Petitioner also stated that he believed he would be in danger of being assaulted in the future by Black and Hispanic inmates if he did not attack Cooper when provided the chance, because he would be perceived to be weak and a coward.  (Id. at 1770-71, 1782.)  On cross-examination, Petitioner admitted that among the reasons he attacked Cooper was the disrespect shown when Cooper, who had not been on the module as long as Petitioner, was moved to a cell with a better view of the dayroom television.  (Id. at 1780-82.)

James Esten, a retired California Department of Corrections employee currently working as a correctional consultant, testified that he was familiar with prison gangs and their activities. (Id. at 1800-06.)  Esten said there is an obligation on members of a prison gang to bring balance to the prison environment when it has become unbalanced by a disproportionate number of assaults on one race by another.  (Id. at 1809-10.)  That obligation falls on the senior member of the race which has been disproportionately assaulted, which in this case was Petitioner because he was the only remaining Black inmate in the Bravo Module and was already serving a prison term.  (Id. at 1811-12.)  Esten believed Petitioner would be the subject of an attack under the circumstances testified to at trial, and said the administration of the jail should have realized there was a threat and moved Petitioner to another module.  (Id. at 1812.)  In Esten's opinion Petitioner had no choice but to attack Cooper, given the fact that Petitioner was not moved, and would have certainly been retaliated against by his own gang for failing to attack Cooper.  (Id. at 1813, 1824-25.)  In Esten's experience guards and correctional officers become

involved in inmate assaults by staging fights, housing enemies next to each other in order to release them on the yard together, providing inmates with alcohol and other contraband in exchange for the inmate attacking other inmates, and by the accidental opening of cell doors. (Id. at 1814-15.)  The defense rested and there was no rebuttal.  (Id. at 1847.)

Petitioner waived his right to a jury trial on the prior conviction allegations, and was allowed to present closing argument himself.  (Id. at 1955-56.)  The jury was instructed (id. at 1957-84), the prosecutor presented closing argument (id. at 1984-95), followed by Petitioner's argument (id. at 1995-2010), and the prosecutor's rebuttal (id. at 2010-16.)  After deliberating about four hours the jury found Petitioner guilty of assault with a deadly weapon, and found true the allegation that he had personally used a deadly weapon while committing the offense.  (Id. at 2020-22, 2055-58.)  In a bifurcated proceeding, the trial judge found the prior conviction allegations to be true.  (Id. at 2064-65.)

Petitioner brought a motion for a new trial based on misconduct by two jurors who were former correctional officers.  (Lodgment No. 1, Clerk's Tr. at 526-40.)  Petitioner argued that one of those jurors described the layout of the jail to the other jurors during deliberations and told them that the inmates control the jail by flexing their muscles because they outnumber the guards, and that the other juror described how the control panels for the cell doors worked.  (Id.) The trial judge denied the motion, finding that although "it probably was misconduct" for the two jurors to make the statements, there was no prejudice because it was undisputed at trial that Petitioner's cell door was opened through the fault of the guard.  (Lodgment No. 16, Reporter's Tr. at 2161-62.)  Petitioner was sentenced to a state prison term of thirty years-to-life, ordered to run consecutively to the term he was serving.  (Id. at 2168; Lodgment No. 5, People v. Thompson, No. D044829, slip op. at 18.)

## IV.

## PETITIONER'S CLAIMS

1. Petitioner received ineffective assistance of appellate counsel in violation of the Sixth Amendment because appellate counsel failed to preserve for appeal federal constitutional claims relating to his discriminatory prosecution defense.  (Pet. at 6-6c.)

2.  The trial court abused it discretion in revoking Petitioner's pro per status, resulting in a denial of Petitioner's Sixth Amendment right to self-representation.  (Pet. at 7-7b.)

3.  The trial court's restriction of, and negative comments on, Petitioner's evidence, deprived Petitioner of his right to present a defense, to a fair trial and to due process, in violation of the Fifth, Sixth and Fourteenth Amendments.  (Pet. at 8-8a.)

4.  Juror misconduct during deliberations demonstrates actual bias requiring reversal of the conviction.  (Pet. at 9-9a.)

**V.**

**DISCUSSION**

For the following reasons, the Court finds that Petitioner's claims do not merit habeas relief.  The Court therefore recommends that judgment be entered denying the Petition.

**A.      Standard of Review.**

Title 28, United States Code, § 2254(a), sets forth the following scope of review:

> The Supreme Court, a Justice thereof, a circuit judge, or a district court shall entertain an application for a writ of habeas corpus in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in <u>violation of the Constitution or laws or treaties of the United States</u>.

28 U.S.C.A. § 2254(a) (West 1994) (emphasis added).

Under 28 U.S.C. § 2254(d):

> (d) An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C.A. § 2254(d) (1)-(2) (West Supp. 2006).

A state court's decision may be "contrary to" clearly established Supreme Court precedent: (1) "if the state court applies a rule that contradicts the governing law set forth in [the Court's] cases" or (2) "if the state court confronts a set of facts that are materially

1  indistinguishable from a decision of [the] Court and nevertheless arrives at a result different from

2  [the Court's] precedent." <u>Williams v. Taylor</u>, 529 U.S. 362, 405-06 (2000).  A decision may

3  involve an "unreasonable application" of clearly established federal law, "if the state court

4  identifies the correct governing legal rule from this Court's cases but unreasonably applies it to

5  the facts of the particular state prisoner's case," or "if the state court either unreasonably extends

6  a legal principle from precedent to a new context where it should not apply or unreasonably

7  refuses to extend that principle to a new context where it should apply." <u>Id.</u> at 407.

8         "[A] federal habeas court may not issue the writ simply because the court concludes in

9  its independent judgment that the relevant state-court decision applied clearly established federal

10 law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable."

11 <u>Lockyer v. Andrade</u>, 538 U.S. 63, 75-76 (2003) (internal quotation marks and citations omitted).

12 Clearly established federal law "refers to the holdings, as opposed to the dicta, of [the United

13 States Supreme] Court's decisions." <u>Williams</u>, 529 U.S. at 412.

14        Habeas relief is also available if the state court's adjudication of a claim "resulted in a

15 decision that was based on an unreasonable determination of the facts in light of the evidence

16 presented in state court." 28 U.S.C.A. § 2254(d)(2) (West Supp. 2006).  In order to satisfy this

17 provision, Petitioner must demonstrate that the factual findings upon which the state court's

18 adjudication of his claims rest, assuming they rest on a factual determination, are objectively

19 unreasonable.  <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003).

20 **B.     Petitioner is not entitled to habeas relief as to claim one.**

21        In claim one, Petitioner contends he received ineffective assistance of counsel in violation

22 of the Sixth Amendment because his appellate counsel failed to preserve for appeal federal

23 constitutional claims relating to his discriminatory prosecution defense.  (Pet. at 6-6c.)

24 Specifically, he argues that the Imperial County Sheriff's administration fostered racial violence

25 at the jail, but shielded Hispanic gang members from criminal prosecution arising from incidents

26 such as the ones testified to at trial and the one he was involved in, whereas the Black inmates

27 would be prosecuted, even though the incidents were all videotaped.  (<u>Id.</u> at 6.)  Petitioner

28 contends his case would have been dismissed prior to trial on his pre-trial motion to dismiss on

the basis of discriminatory prosecution but for the fact that the prosecution withheld evidence relevant to that issue.  (Id. at 6a.)  He contends the trial judge was biased against him due to his pro per status, and demonstrated that bias by restricting his ability to introduce evidence of political motivation for the assaults by limiting his ability to question inmate Walker on direct examination regarding that issue, and by stripping Petitioner of his power to subpoena relevant records.  (Id. at 6a-6b.)  Petitioner states that his appellate counsel was non-responsive to his numerous requests to raise these issues on appeal as federal constitutional claims, and to investigate his allegation that the prosecution withheld evidence.  (Id. at 6c.)  He attributes appellate counsel's inaction "to a conflict of interest upon recognizing the economic feasability of the conspiracies of law enforcement in the exploitation of the Black inmate population, and the politics involved."  (Id.)

Respondent contends that the denial of this claim by the state court on the basis that Petitioner had failed to present a prima facie case for ineffective assistance of counsel was neither contrary to, nor involved an unreasonable application of, United States Supreme Court precedent.  (Ans. Mem. at 7-8.)  Respondent also argues that the claims which Petitioner contends should have been raised by appellate counsel are based on matters outside the trial record, and as such could only have been raised in the state appellate court in a habeas petition.  (Id. at 9-10.)  Thus, because Petitioner has no right to counsel on collateral review, Respondent argues that appellate counsel could not have violated Petitioner's right to counsel by failing to raise such claims, and that in any case appellate counsel was not ineffective for failing to raise claims which are without merit.  (Id. at 9-10.)

Petitioner presented claim one to the state supreme court in a petition for review of the opinion of the appellate court denying his habeas petition.  (Lodgment No. 13.)  That petition was denied by an order which stated in full:  "Petition for review DENIED."  (Lodgment No. 15, In re Thompson, No. S144233 (Cal. June 26, 2006).)  Claim one was also presented to the state appellate court in a habeas petition.  (Lodgment No. 6.)  That petition was denied in a two-page per curiam opinion.  (Lodgment No. 7, In re Thompson, No. D046375 (Cal.Ct.App. June 20, 2005).)

In Ylst v. Nunnemaker, 501 U.S. 797, 804 (1991), the Court adopted a presumption which gives no effect to unexplained state court orders but "looks through" them to the last reasoned state court decision.   The Court will therefore look through through the silent denial by the state supreme court to the appellate court opinion.   The appellate court stated:

> In this petition, Thompson is again challenging his conviction.   He asserts various grounds for relief all of which stem from his claim that his assault crime was provoked by prison guards for political reasons.   We conclude Thompson has failed to state a prima facie case for relief.
>
> A petition for writ of habeas corpus must state a prima facie case for relief or it will be denied. (People v. Duvall (1995) 9 Cal.4th 464, 475.)   To satisfy this requirement, the petition must state fully and specifically the facts justifying relief.   It must also include reasonably available supporting evidence, including trial transcripts and/or affidavits or declarations.   (Id. at p. 474.)   Conclusory allegations made without any explanation of the basis for them do not support the granting of relief or even an evidentiary hearing. (Ibid.)
>
> In this case, the only evidence Thompson provides to support his political provocation claim is newspaper articles and editorials.   These documents are not evidence.   Even if these documents were evidence, they do not support Thompson's claim.   At most, they show that some prison guards are corrupt.   They do not show that the prison guards involved in Thompson's case were corrupt or that they provoked his assault.   [¶]   The petition is denied.

(Lodgment No. 7, In re Thompson, No. D046375 at 1-2.)

The clearly established United States Supreme Court law governing ineffective assistance of counsel claims is set forth in Strickland v. Washington, 466 U.S. 668 (1984).   See Baylor v. Estelle, 94 F.3d 1321, 1323 (9th Cir. 1996) (stating that Strickland "has long been clearly established federal law"); Smith v. Robbins, 528 U.S. 259, 285 (2000) (the Strickland standard applies to claims of ineffective assistance of appellate and trial counsel). For ineffective assistance of counsel to provide a basis for habeas relief, Petitioner must demonstrate two things. First, he must show that counsel's performance was deficient.   Strickland, 466 U.S. at 687. "This requires showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment."   Id.   Second, he must show counsel's deficient performance prejudiced the defense.   Id.   This requires a showing of a reasonable probability that he would have prevailed on appeal.   Robbins, 528 U.S. at 285-86; Wildman v. Johnson, 261 F.3d 832, 840 (9th Cir. 2001).

/ / /

Respondent first argues that the issues encompassed in claim one could only have been presented to the state appellate court in a habeas petition since they rely on matters outside the trial record, and because Petitioner has no Sixth Amendment right to counsel in his state habeas proceedings, his ineffective assistance of appellate counsel claim is without merit. (Ans. Mem. at 9-10.) In Pennsylvania v. Finley, 481 U.S. 551 (1987), the Supreme Court held that the Sixth Amendment right to counsel "extends to the first appeal of right, and no further." Id. at 555. In Coleman v. Thompson, 501 U.S. 722 (1991), the Supreme Court reaffirmed that there is no right to appointment of counsel in state collateral proceedings or on discretionary appeals, but left open the question of whether there is a constitutional right to appointment of counsel to indigent prisoners in state collateral proceedings when collateral review is the first forum in which a prisoner can challenge a conviction. Id. at 754-56. The Ninth Circuit has since rejected the argument that because California requires certain claims to be presented in collateral proceedings, the Sixth Amendment right to counsel on appeal extends to those types of collateral proceedings. Jeffers v. Lewis, 68 F.3d 299, 300 (9th Cir. 1995); Bonin v. Vasquez, 999 F.2d 425, 429-431 (9th Cir. 1993).

Accordingly, Petitioner did not have a Sixth Amendment right to the assistance of counsel with respect to those issues which he sought to have appellate counsel raise which were premised on matters outside the trial record. Included in this category are the allegations that the prosecution withheld evidence relating to the discriminatory prosecution defense, and how that affected the resolution of the pre-trial motion to dismiss. However, even to the extent Petitioner had a right to counsel with respect to such claims, he is not entitled to habeas relief because the claims are without merit for the reasons discussed below in claim three.

With respect to the appellate issues which Petitioner requested appellate counsel to raise which do not rely on matters outside the record, the Strickland standard applies for determining whether appellate counsel rendered ineffective assistance in failing to present them. Robbins, 528 U.S. at 285. Such issues are included in the claim the trial judge showed bias against Petitioner due to his pro per status by restricting his ability to introduce evidence of political motivation for the assaults by limiting his ability to question inmate Walker on direct

examination regarding that issue and by stripping Petitioner of his power to subpoena relevant records.  Appellate counsel actually raised a claim on direct appeal alleging that the trial judge improperly interfered with Petitioner's ability to fully present his defense of self-defense by abusing his discretion in ruling that the video evidence of Walker's second assault was cumulative and would consume an undue amount of time "to very little effect."  (Lodgment No. 2 at 13-20.)  Counsel also argued that the trial judge's comments and criticism with respect to the manner in which Petitioner presented his defense and with respect to the evidence presented implied a bias against Petitioner.  (Id. at 20-22.)  As to these issues, Petitioner is not entitled to habeas relief on an ineffective assistance of counsel claim because they were actually presented to the appellate court and adjudicated on their merits.  Moreover, for the reasons discussed below with respect to claim three, which presents these same issues, Petitioner has failed to demonstrate the existence of a bias by the trial judge or any prejudice to his defense flowing from the trial judge's comments or rulings.

To the extent there are additional issues, other than the ones discussed below with respect to claims two and three, which Petitioner contends should have been raised on appeal but were not, that is, additional examples of the trial judge making comments on or showing a bias towards Petitioner's defense, the state appellate court's rejection of the claim on the basis that Petitioner failed to make a prima facie case is an objectively reasonable application of Strickland.  As explained in claims two and three below, where the Court considers examples given by Petitioner of alleged bias by the trial judge and prejudice to his ability to present his defense, including those examples identified in claim one, Petitioner has not identified bias or prejudice with respect to the manner in which he was treated by the trial judge.  The Court also considers in relation to claim three Petitioner's contention that the trial judge interfered with his ability to conduct discovery and subpoena records, and his contention that the prosecution withheld evidence in violation of Brady v. Maryland, 373 U.S. 83, 87 (1963) (holding that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment.").  Because Petitioner has not identified any examples of prejudicial bias or interference with his ability to present his

06cv1758

discriminatory prosecution defense, he has not identified prejudice under <u>Strickland</u> flowing from appellate counsel's failure to present such claims.  Thus, the appellate court's rejection of the claim did not involve an unreasonable application of <u>Strickland</u>, and the Court recommends denying habeas relief.  <u>Williams</u>, 529 U.S. at 404-05; <u>Strickland</u>, 466 U.S. at 687; <u>Robbins</u>, 528 U.S. at 285-86.[1]

**C.     Petitioner is not entitled to habeas relief as to claim two.**

Petitioner contends in claim two that the trial court abused its discretion in prematurely revoking his pro per status during the trial, resulting in a denial of his right of self-representation.  (Pet. at 7-7a.)  Petitioner argues that he responded ambiguously to the trial judge's warning that he would lose his pro per status if he continued to disobey the ruling that he could not elicit further testimony from inmate Walker regarding the political motivation for his prosecution and guilty plea.  (Id.)  Petitioner contends the trial judge should have stopped the proceedings and conducted a hearing to determine whether he intended to obey the ruling before revoking his pro per status.  (Id.)  He contends the trial judge acted to protect the interest of the judge's wife, an employee of the district attorney's office, which could have been implicated in civil or criminal liability arising from a showing that political motivation was behind the discriminatory prosecution of inmates at the county jail.  (Id.)

Respondent contends that the trial court was extremely patient with Petitioner throughout the proceedings, which were delayed by a long list of improper procedures by Petitioner, culminating in his refusal to abide by the trial court's ruling near the end of the trial.  (Ans. Mem. at 10-14.)  Respondent argues that the state court's denial of the claim on that basis was

---

[1] Petitioner alludes to additional claims he contends his appellate counsel should have raised, including an Eighth Amendment challenge to the use of California's Three Strikes Law in imposing sentence and ineffective assistance of trial counsel in sentencing.  (See Pet. at 6a; Traverse at 2.)  To the extent Petitioner intended the vague references to sentencing to be individual examples of his appellate counsel's deficient performance, they are entirely conclusory and provide no basis for habeas relief. <u>James v. Borg</u>, 24 F.3d 20, 26 (9th Cir. 1994) (Conclusory allegations unsupported by specific facts do not merit habeas relief).  Neither were they raised in the state supreme court.  (See Lodgment No. 13.)  In any case, the apparent basis for the sentencing claims appears to be the trial judge's statement that he did not prepare in advance of the sentencing hearing due to the unavailability of the court file, coupled with Petitioner's refusal to waive time and his demand for immediate sentencing.  (Lodgment No. 16, Reporter's Tr. at 2166-67.)  Petitioner has not alleged any facts regarding why his Eighth Amendment rights were violated in this regard, nor has he identified any basis for a finding of deficient performance by his trial counsel in the sentencing proceedings.

1   neither contrary to nor involved an objectively unreasonable application of clearly established

2   federal law as set forth in <u>Faretta v. California</u>, 422 U.S. 806 (1975), which Respondent contends

3   provides that a trial judge may terminate self-representation of a defendant who deliberately

4   engages in obstructionist misconduct.  (Ans. Mem. at 14-15.)

5        The Court will look through the silent denial of claim two by the state supreme court to

6   the appellate court opinion, which stated:

> The revocation occurred towards the end of Thompson's questioning of inmate Walker.  Thompson questioned Walker on direct examination.  During cross-examination, the prosecutor asked Walker about his prior felony conviction for assault on a correctional officer.  On redirect examination, Thompson sought to elicit details about the incident underlying the felony conviction.  The court sustained the prosecutor's relevancy objection to the question.  Undeterred, Thompson continued asking questions about Walker's prior felony conviction.  Sustaining further objections by the prosecutor, the court explained to Thompson that Walker's prior conviction was admitted only for impeachment, and ruled that Thompson could not delve into issues surrounding the prior conviction.  [Footnote:  The facts underlying Walker's prior conviction for assault on a correctional officer apparently arose in the context of the October 19 retaliatory assault by Walker on a Hispanic.  Thompson's continued questioning sought to explore why the prosecutor charged Walker with assault on a correctional officer and Walker's motivation for accepting a plea bargain.]  The court instructed Thompson to stop asking questions on the subject.
>
> Thompson persisted and asked another question about the prior conviction.  The court then told Thompson: "I'm not going to allow you to ask anymore questions on that. [¶]  If you insist on doing that, if you insist on disobeying my rulings, I'll have to take some action to bring in your standby counsel and to replace you."  Thompson responded: "That's what you['re] going to have to do."  The court stated: "I'm sorry, what?"  Thompson repeated: "Then that's what you['re] going to have to do, Your Honor."  The court then revoked Thompson's right of self representation and instructed standby counsel to represent him.  The trial court granted defense counsel's request for a continuance until the following week to allow counsel time to prepare the remainder of the case.
>
> A trial court must allow a defendant to represent himself if the defendant knowingly and intelligently makes an unequivocal and timely request.  (*People v. Valdez* (2004) 32 Cal.4th 73, 97-98.)  However, once granted, the right of self-representation is not a "'license not to comply with relevant rules of procedural and substantive law.'"  (*People v. Carson* (2005) 35 Cal.4th 1, 8.)  The right of self-representation may be terminated if a defendant engages in "'deliberate dilatory or obstructive behavior' (that) threatens to subvert 'the core concept of a trial' . . . or to compromise the court's ability to conduct a fair trial . . . ."  (*Id.* at p. 10.)  When determining whether termination is appropriate, the trial court should consider such factors as the nature of the misconduct, its impact on the trial proceedings, the availability of alternative sanctions, whether the defendant was warned that particular misconduct will result in termination, and whether the defendant intentionally sought to disrupt or delay the trial.  (*Ibid.*)  Each case must be evaluated in its own context, and on appeal we apply the abuse of discretion standard.  (*Id.* at pp. 10, 12.)

Here, Thompson continued a line of questioning he was expressly told to stop. The court warned him that if he continued to disobey the ruling, standby counsel would replace him. In response, Thompson plainly told the court to implement the replacement. Based on his words and conduct, Thompson made clear to the court that he would not follow the evidentiary ruling, and he would rather have standby counsel representing him than obey the ruling. Certainly the "core concept of a trial" is obstructed if the court's rulings are not obeyed. Given Thompson's refusal to comply with the ruling, the court's decision to revoke his right of self-representation was a reasonable exercise of its discretion.

The reasonableness of the court's ruling is further underscored when the record is viewed in its entirety. Prior to the revocation, Thompson represented himself during all the pretrial proceedings, the entire prosecution case, and a substantial portion of the defense case. The court patiently allowed Thompson to handle his case as he deemed appropriate. There are no indications that the court considered revoking Thompson's right of self-representation at any point until Thompson expressly defied the court's ruling. Further, the court allowed Thompson to again represent himself during closing arguments to the jury. It is evident that the court understood the importance of Thompson's right of self-representation and only retracted that right temporarily when necessary to maintain control of the trial.

(Lodgment No. 5, <u>People v. Thompson</u>, No. D044829, slip op. at 6-8.)

The clearly established United States Supreme Court law governing the right to self-representation is set forth in <u>Faretta v. California</u>, 422 U.S. 806 (1975). In <u>Faretta</u>, the United States Supreme Court held that the structure of the Sixth Amendment impliedly grants to the accused personally the right to make his defense, and that the Sixth Amendment therefore necessarily implies a right to self-representation. <u>Id.</u> at 819-21. A state violates a criminal defendant's constitutional right to self-representation when it forces him to accept a state-appointed attorney after he knowingly and intelligently waives his Sixth Amendment right to counsel and clearly and unequivocally declares a desire to represent himself. <u>Id.</u> at 835-36. However, as the state court here correctly recognized, a "trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct." <u>Id.</u> at 834 n.46.

The state appellate court recognized and applied the principles just described. The record supports the appellate court's finding that the trial judge was patient with Petitioner. (<u>See</u> <u>e.g.</u> Lodgment No. 16, Reporter's Tr. at 1522 ("And I want the record to reflect . . . the fact that [Petitioner] sometimes spends an enormous amount of time between questions. So that the record itself would read a certain way, but it wouldn't reflect the amount of time that's being

consumed here."); id. at 1529 ("I am not supposed to treat you any different than if you had an attorney, and it dawns on me I would never let an attorney drag something like this out this long.").) Petitioner was permitted to represent himself for the entire pre-trial process and nearly the entire trial, with the exception only of that portion of the trial where Petitioner explicitly refused to abide by the trial judge's ruling. (Id. at 1557-59.) The trial judge permitted Petitioner to resume his pro per status and present closing arguments once the trial testimony closed and Petitioner's ability to defy the trial judge's ruling ended. Thus, Petitioner was given more leeway than an attorney would have been given throughout the trial, and it was only toward the end of trial that the judge told Petitioner that if he continued to disobey his ruling he would revoke his self-representation status. In response to the trial judge's warning that he would appoint standby counsel to take over the defense if Petitioner refused to obey his ruling, Petitioner told the trial judge three times: "Then that's what you [are] going to have to do." (Lodgment No. 16, Reporter's Tr. at 1559.) Petitioner contends his response was ambiguous and the trial judge should have stopped the proceedings and conducted a hearing to determine whether he intended to obey the ruling. (Pet. at 7.) Petitioner's response clearly was not ambiguous.

Revoking Petitioner's pro per status for directly refusing to abide by the trial judge's ruling was consistent with Faretta. Faretta, 422 U.S. at 834 n.46 (a "trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct.") Petitioner has not demonstrated bias or pretext by the trial judge in limiting the scope of Walker's testimony. Rather, Walker actually testified that in his opinion Black inmates involved in assaults at the jail were treated unfairly because they were charged with misconduct but the Hispanic inmates were not. (Lodgment No. 16, Reporter's Tr. at 1544-45.) Walker's subjective reasons for accepting the plea deal, even if relevant to the discriminatory prosecution issue, would, as the trial judge ruled, be cumulative to that testimony. Petitioner's allegation that the trial judge harbored bias in order to protect his wife from scandal should it be discovered that the district attorney's office was involved in the alleged discriminatory prosecutions, is wholly unsupported. Petitioner has not demonstrated that his direct and adamant refusal to follow the

1 trial judge's ruling was excusable, was used as a pretext for revoking his pro per status, or was

2 in any way outside the scope of the discretion set forth in <u>Faretta</u> for revoking a defendant's pro

3 per status.

4       Accordingly, the Court finds that the state appellate court's adjudication of claim two was

5 neither contrary to, nor involved an unreasonable application of, clearly established federal law,

6 and was not based on an unreasonable determination of the facts. The Court therefore

7 recommends habeas relief be denied as to claim two.

8 **D.    Petitioner is not entitled to habeas relief as to claim three.**

9       In claim three, Petitioner contends that the trial court's restriction of, and negative

10 comments on, his evidence, deprived him of his right to present a defense, to a fair trial and to

11 due process, in violation of the Fifth, Sixth and Fourteenth Amendments.  (Pet. at 8-8a.)

12 Specifically, he contends that:  (1) the trial judge limited the length of a videotape of the Walker

13 assault which Petitioner was allowed to show the jury, which prevented the jury from seeing

14 blood on Petitioner's hands; (2) the trial judge referred to Petitioner's evidence of discriminatory

15 prosecution and his evidence corroborating his version of the assault as marginal, lacking

16 probative value and wasting time; and (3) Petitioner's attempt to testify as to his personal

17 knowledge that the guards "had something to do with" the assaults and with opening the cell

18 doors, was prevented when the trial judge sustained a prosecution objection that such testimony

19 was speculative, despite the fact that Petitioner had gained personal knowledge of guard

20 misconduct through prior civil litigation against the jail administration.  (<u>Id.</u> at 8-8a.)  The Court

21 will also consider the contentions raised in claim one that the prosecution withheld evidence

22 relevant to the discriminatory prosecution defense, and that the trial judge interfered with

23 Petitioner's subpoena power.  (<u>Id.</u> at 6-6a.)

24       The Court will look through the state supreme court's silent denial of this claim to the

25 appellate court opinion, which stated:

26         Thompson argues the court erred in excluding evidence regarding violence
   by Hispanics against African-American inmate Walker.  As noted, Thompson

27    presented evidence regarding two incidents of violence perpetrated against Walker
   by Hispanics: one incident occurring when Walker's arm was cut through a tray

28    slot, and the other incident occurring when a cell door suddenly opened and
   Walker was attacked in the corridor.  The jury was allowed to view a portion of

a jail surveillance video showing the corridor attack. Thompson asserts the trial court (1) erroneously excluded the remainder of the corridor video (which video was about one hour in length), and (2) erroneously excluded a video showing Thompson helping Walker wrap Walker's bloody arm after the tray slot cutting incident.

At trial, Thompson argued that the corridor video was relevant because it allowed the jury to see the correctional officer's action of "racking" (i.e., opening) the cell door to allow the Hispanic inmate out. The court admitted this portion of the corridor video, but excluded the remainder of the corridor video as well as the arm-wrapping video on the basis that they were cumulative and unduly time-consuming under Evidence Code section 352.

We review a trial court's evidentiary rulings for abuse of discretion. (*People v. Waidla* (2000) 22 Cal.4th 690, 717.)

Thompson has not described any images in the excluded portions of the corridor video which support his defense. We have viewed the video and see nothing helpful to his case other than what was shown to the jury. The court did not abuse its discretion in excluding the remainder of the corridor video.

As to the arm-wrapping video, Walker testified that when his arm was cut, Thompson assisted him by providing a wet towel through a tray slot for Walker to wrap his arm. Thompson argued the video should be admitted because it showed Thompson "actually bringing in these articles of linen with blood all over it," which affected his state of mind at the time he attacked Cooper.

Assuming arguendo that the court should have allowed the jury to see the arm-wrapping video to support Thompson's claim that he feared an attack by Hispanic gang members, including Cooper (see *People v. Minifie* (1996) 13 Cal.4th 1055, 1065-1069), the error was not prejudicial. Both Walker and Thompson testified that Thompson assisted Walker when his arm was cut. Thompson described his observations of Walker's arm injuries, stating that Walker's arm was deeply cut and that he (Thompson) tried to restrict the bleeding by giving Walker a wet piece of linen from his bed. Photographs of Walker's arm injuries were admitted into evidence; Thompson was shown the photographs and stated he observed the injuries. Thus, the jury was apprised of the extent of Walker's injuries, and informed that Thompson saw the injuries. A video showing Thompson's observation of Walker's blood would not have provided the jury with additional evidence significant enough to affect its ultimate decision in the case. Because there is no reasonable probability that jury would have reached a different result had it seen the arm-wrapping video, reversal is not warranted even if there was error. (*People v. Humphrey* (1996) 13 Cal.4th 1073, 1089.)

Without any specific citation to the record, Thompson also asserts that the court restricted his examination of Walker regarding these two incidents. The argument is unavailing. The record shows the court permitted full questioning of Walker regarding the incidents.

Thompson argues error arising from exclusion of the videos was compounded because the court evinced a bias against him by criticizing him for wasting too much time and by characterizing his evidence as irrelevant. We are not persuaded. The record shows the court allowed Thompson substantial leeway in his presentation of evidence, but sought to control the proceedings when the court ascertained he was belaboring marginally relevant or irrelevant matters. The jurors would have understood that the court was merely exercising its judicial

function in the context of a pro per defendant and was not personally criticizing or showing a bias against Thompson.

(Lodgment No. 5, <u>People v. Thompson</u>, No. D044829, slip op. at 8-11.)

State evidentiary rulings do not give rise to claims cognizable on a federal habeas proceeding unless the evidentiary ruling violated Petitioner's due process right to a fair trial. <u>Estelle v. McGuire</u>, 502 U.S. 62, 70 (1991); <u>Gordon. v. Duran</u>, 895 F.2d 610, 613 (9th Cir. 1990). In order to establish a due process violation, Petitioner must show that the trial court's rulings were so prejudicial that they rendered his trial fundamentally unfair. <u>Ortiz-Sandoval v. Gomez</u>, 81 F.3d 891, 897 (9th Cir. 1996); <u>Jammal v. Van de Kamp</u>, 926 F.2d 918, 919 (9th Cir. 1991).

Petitioner first contends the trial judge limited the length of a videotape of the Walker assault which Petitioner was allowed to show the jury, which prevented the jury from seeing blood on Petitioner's hands. (Pet. at 8.) The appellate court correctly found that such evidence was cumulative. The trial court allowed the jury to view a video of the assault on Walker when he was coming back from court and a door was mistakenly opened and another inmate charged him. (Lodgment No. 16, Reporter's Tr. at 1550-51.) Petitioner testified that he witnessed that attack, which was depicted in the portion of the video shown to the jury, that the video was an accurate description of the events, and he described the incident to the jury with the aid of a photograph of the Bravo Module published to the jury. (<u>Id.</u> at 1740.) Petitioner has failed to identify here or in state court why the other portions of that video were relevant to his defense. There is also no indication that Petitioner had Walker's blood on his hands after that assault. Rather, Petitioner contends it was the time when Walker reached into an Hispanic inmate's cell and was cut with a razor that Petitioner had Walker's blood on his hands. The trial judge ruled that the video of that incident was cumulative. (<u>Id.</u> at 1552.) Walker testified that he was giving water to an Hispanic inmate through a food port when the inmate slashed Walker's arm with a razor, and that Petitioner wrapped Walker's arm in a wet towel just before Walker was taken for medical treatment. (<u>Id.</u> at 1540-42.) Petitioner testified that Walker came to Petitioner's cell immediately after the assault and that he observed Walker's wounds when he assisted Walker

1  in stopping the bleeding.  (Id. at 1734.)  Petitioner described Walker's wounds to the jury, and

2  the jury was shown photographs of the wounds, which Petitioner authenticated.  (Id. at 1735-37.)

3  Thus, consistent with the trial judge's rulings, the video of Petitioner helping Walker stop

4  his bleeding was cumulative, and that portion of the video of the Walker assault which did not

5  depict the actual assault was irrelevant.  The state appellate court's finding that the portion of

6  the video of the first incident would not have provided "additional evidence significant enough

7  to affect" the jury's verdict, and the finding that "there is no reasonable probability that jury

8  would have reached a different result had it seen the arm-wrapping video," was therefore neither

9  contrary to, nor involved an unreasonable application of clearly established federal law, and was

10  not based on an unreasonable determination of the facts.

11  Petitioner next argues that the trial judge unfairly referred to his discriminatory

12  prosecution evidence and the evidence corroborating his version of the assaults, as marginal,

13  lacking probative value and wasting time.  (Pet. at 8.)  He also contends his attempt to testify as

14  to his personal knowledge that the guards "had something to do with" the assaults and with

15  opening the cell doors, was unfairly prevented when the trial judge sustained a prosecution

16  objection that such testimony was speculation despite the fact that Petitioner had gained personal

17  knowledge of guard misconduct through separate litigation brought by Petitioner against the jail

18  administration.  (Id. at 8-8a.)  In support of this claim, Petitioner refers to the following passage

19  when he was on the witness stand giving direct testimony.  He contends it shows that the trial

20  judge limited his ability to present his defense that he was afraid that an assault on his person

21  was imminent, and that the judge denigrated the defense to the jury:

22
Defense Counsel:    Is it your position that you felt that the guards were – had something
23                              to do with these other assaults?

Petitioner:     Yes sir.
24
Defense Counsel:     What did you believe – what role do you believe that they played?
25
Prosecutor:    Objection, lacks foundation, calls for speculation.
26
Defense Counsel:     My next question is going to be foundational.
27
The Court:    Repeat the question.
28

Defense Counsel:   Why is it that you believe that the guards had anything to do with these prior racking of the doors?

Petitioner:   Well, based upon the fact, like I say –

Prosecutor:   Objection, it calls for speculation.

The Court:   It is speculation.  I would have to sustain that objection.

Defense Counsel:   I think it's a foundational question.  If his answer does involve speculation, the Court can strike it.

Prosecutor:   Your Honor, as –

The Court:   You are not going to establish that he had knowledge of this before it happened.  He'll give his theory of what happened, and that's just speculation.

Defense Counsel:   I believe that he did testify that he personally observed one of the doors open.

The Court:   One of the doors opened.  But how does that mean that somebody is intentionally trying to set up the situation?  [¶]  That's the speculation.

Defense Counsel:   During your conversation with Officer Covin did he ever say anything that led you to believe that the guards would assist in any attack upon you or any other black?

Prosecutor:   Objection, calls for hearsay.

Defense Counsel:   State of mind, Your Honor.

The Court:   I think we're going – we are getting into a lot of hearsay on this idea of state of mind – going to the state of mind.  But you can't establish how the guards acted through his state of mind.  [¶]  So I'm going to sustain that objection.

(Id. at 1745-46.)

Immediately thereafter Petitioner testified that he held the subjective belief, based on his conversations with and warnings from Officer Covin, and based on the assaults on Walker which he knew of and those he witnessed, that he was going to be assaulted by another inmate soon, that the guards were going to set it up, and that he would likely be handcuffed and unable to defend himself when it happened.  (Id. at 1746-47.)  He testified that he initiated the assault on Cooper because he believed that the guards were setting him up to be assaulted by Cooper, or intended to do so later that day when he was unable to defend himself, and that he thought the guards were conspiring to have him murdered.  (Id. at 1764, 1768.)  Thus, the trial judge's

limitation of Petitioner's testimony as to his opinion of the subjective state of mind of the guards did not prevent him from testifying that he believed the guards were planning to set up an assault.

The trial judge did, however, characterize as speculation, in front of the jury, Petitioner's version of the guards' involvement in the assaults at the jail.  That is, the trial judge announced that Petitioner's belief that the guards intentionally opened or "racked" the cell doors in order to deliberately provide inmates with the opportunity to assault each other, was speculation.  The trial judge's characterization was neither inaccurate nor prejudicial.  Petitioner's defense was based on the theory that he was acting in self-defense or was entrapped by the guards, and Officer Covin provided testimony in support of this theory, as did Petitioner, Walker, and Petitioner's expert witness.  The jury was instructed on Petitioner's defense theory and was free to believe his version.  (Id. at 1972-76.)  Petitioner argued his theory to the jury.  (Id. at 2003-09.)  The trial judge's observation that Petitioner was speculating that the guards were intentionally permitting the assaults to occur was an accurate characterization of the state of the evidence, and the judge's comments did not preclude the jury from finding Petitioner's theory to be true, nor in any way suggested to the jury it was false.[2]

Petitioner argues that his belief was not speculation because he was at the time of trial, and is now, in possession of evidence which proves that the guards deliberately racked cell doors in order to cause assaults.  (Pet. at 8-8a.)  However, as the state court noted, this "evidence" is not evidence at all, but consists of opinions in the form of newspaper articles and investigative reports supported by the same or similar facts which Petitioner used to support his opinion at trial that the guards deliberately arranged fights.  (Id.; see also Attachments to Lodgment Nos. 6, 10-11; Pet's Notice of Lodgment [Doc. No. 5] Ex. A.)  At most these documents support the speculative, subjective belief that the guards acted intentionally.  Absent direct admission by a guard that he or she deliberately opened a cell door in order to facilitate an assault, Petitioner's

---

[2]  The Oxford English Dictionary lists a primary definition of "speculate" as "to theorize upon." See Oxford English Dictionary (2nd Ed. 1989).  Because Petitioner's theory was just that, a theory, which he was attempting to prove to the jury through his own observations and the observations and opinions of Covin, Walker and his expert witness, the trial judge's characterization was accurate.

opinion, and those of the newspaper reports and other documents alluded to by Petitioner, is accurately characterized as speculation.

Petitioner argues that if he had not been denied adequate pre-trial discovery, such as access to or use of the personnel and disciplinary files of the guards, or if the prosecution had not unlawfully withheld evidence relating to his theory, his speculation would have ripened into fact. (Pet. at 8-8a.) However, the state court correctly found that Petitioner was provided a full and fair opportunity to prove his theory to the jury. The record contains Petitioner's numerous motions for discovery, the prosecution's oppositions to those motions, as well as the motions to quash Petitioner's subpoenas, the resolution of which took more than a year. (Lodgment No. 1, Clerk's Tr. at 13-490.) Standby counsel made a motion for mistrial immediately after taking over the defense on the basis that Petitioner had failed to bring appropriate discovery motions or to properly argue the discovery motions he had brought. (Lodgment No. 16, Reporter's Tr. at 1704.)

Petitioner refers in particular to a discovery motion he filed in which he sought documents identifying any incidents in a period of three years where inmates at the Imperial County Jail were referred to the district attorney's office for prosecution. (Pet. at 6a; Lodgment No. 1, Clerk's Tr. at 324-44.) A hearing was held as to his request where the prosecution indicated it had turned over records of all referrals from the Imperial County Sheriff's Office to the district attorney's office for evaluation regarding the possibility of prosecution of inmates from approximately October 2003 to January 2004. (Lodgment No. 16, Reporter's Tr. at 903.) The prosecution stated that it understood Petitioner was contending that Black inmates were being prosecuted and Hispanic inmates were not, and stated that although they had initially objected to Petitioner's discovery demand on the basis that his request for records from a three-year period was overly broad and burdensome, they had met and conferred with Petitioner and narrowed the request down to approximately three months' worth of information. (Id. at 904-05.) The prosecution stated that they had turned over the information regarding the referrals and had identified which inmates were prosecuted. (Id. at 911-12.) Petitioner objected that the materials he received were "not consistent with the information that was requested," but did not

explain why the materials were deficient.  (Id. at 910.)  The trial judge very patiently allowed Petitioner several attempts to articulate the basis for his belief as to why the discovery was incomplete or had otherwise violated the judge's discovery order.  (Id. at 905-12.)  The trial judge then made the following ruling:

> The court can only make the following statement:  The people are representing that they have complied with the court's order regarding discovery.  I have inquired of Mr. Thompson for his position regarding that.  As best I can make out, he's objecting because the discovery that was ordered has not been provided to him, but I cannot determine what the basis is for Mr. Thompson's position nor what evidence or information exists that would cause him to feel that there has been lack of compliance.  I just cannot say anything more than that.  So there's insufficient evidence before me to make any ruling that there has not been compliance.

(Id. at 912.)

Although Petitioner once again contends the prosecution failed to produce the requested materials (Pet. at 6a), he once again fails to identify any specific errors attributable to anyone other than himself in the voluminous record of his attempts to obtain discovery of documents supporting his discriminatory prosecution defense.  Rather, it appears any failure in his ability to conduct discovery was based on his inability to properly seek discovery, for which he cannot now complain.  Faretta, 422 U.S. at 834 n.46 ("The right of self-representation is not a . . . license not to comply with relevant rules of procedural and substantive law.")

Petitioner has also failed to support his allegation that the prosecution withheld evidence material to his defense in violation of Brady.  Petitioner did in fact present strong evidence that the only way an attack could happen in the structured setting of the Bravo Module was if the guards permitted it, either intentionally or accidentally.  Although the guard in Petitioner's incident claimed the cell door was opened by mistake, the history of "mistakes" by the guards which led to Petitioner's incident was well-documented by Petitioner at trial.  Both he and Walker testified that it had happened to them, and the jury was shown a video of it happening to Walker.  Officer Covin testified that one of the assaults on Petitioner by an Hispanic inmate was caused when the Hispanic inmate was "wrongly" released on the yard behind Petitioner. (Lodgment No. 16, Reporter's Tr. at 1519-20.)  In addition, Petitioner's expert witness testified that assaults caused by "accidentally" opening cell doors is one method guards use to assist an

inmate who wishes to attack another inmate.  (Id. at 1815.)  Although Petitioner criticizes the ruling of the trial judge granting a motion to quash subpoenas Petitioner issued on the basis that they were overly broad and not legally issued (id. at 1007; Pet. at 6a), he once again fails to identify a basis for his contention that the ruling was erroneous or evinced a bias by the trial judge.  In any case, as discussed below with respect to the juror misconduct claim, it is clear that the verdict was not effected by a determination whether the guard opened the door to Petitioner's cell intentionally or accidentally.  Thus, the lack of any objective proof of the subjective state of mind of the guards, assuming it existed and Petitioner was prevented from presenting it through an error by the trial court in its rulings on Petitioner's discovery requests or the prosecution's motions to quash his subpoenas or withholding of evidence, was not so prejudicial that it rendered Petitioner's trial fundamentally unfair.  Ortiz-Sandoval, 81 F.3d at 897; Jammal, 926 F.2d at 919.

Moreover, even if Petitioner were able to come forward with direct evidence of the guards' subjective intent, the state appellate court correctly observed that:  "[T]he fact that Thompson initiated the attack against Cooper, under circumstances where Cooper was handcuffed and made no movements towards Thompson, provided strong evidence to defeat Thompson's claim of self-defense.  (See *People v. Minifie, supra*, 13 Cal.4th at p. 1068; *In re Christian S.* (1994) 7 Cal.4th 768, 783 (danger must appear to be immediate and present to support self-defense.)  (Lodgment No. 5, People v. Thompson, No. D044829, slip op. at 15.) The record contains additional evidence that Petitioner attacked Cooper for reasons other than self defense.  This included testimony by Petitioner and his expert witness that there is a code of behavior for inmate gang members in prisons and jails which is based on respect, that Petitioner had a duty to carry out retaliatory assaults on rival gang members, and that he would have been perceived to be weak and a coward if he didn't attack Cooper.  (Lodgment No. 16, Reporter's Tr. at 1714-19, 1770-71, 1782, 1810.)  Although Petitioner used this as evidence supporting the reasonableness of his belief that he would be assaulted or that Cooper would attack him, it also weakened his self-defense theory by providing another explanation why he would attack Cooper when he was handcuffed and defenseless.  Petitioner also admitted that

among the reasons he attacked Cooper was the disrespect shown when Cooper, who had not been on the module as long as Petitioner, was moved to a cell with a better view of the dayroom television.  (Id. at 1780-82.)

Finally, Petitioner contends the trial judge interfered with his ability to prove that Black inmates are disproportionately prosecuted compared to Hispanic inmates when prosecutions arise from assaults at the Imperial County Jail.  Specifically, he contends the trial judge refused to permit Walker to testify as to why the "took the deal" when he was prosecuted for assaulting a correctional officer, and interfered with his ability to subpoena records which might have supported the defense or the pre-trial motion to dismiss.  (Pet. at 6a-6b.)  Assuming Walker would have testified that he took the deal because he knew, as a Black inmate, that he would be prosecuted harshly due to the discriminatory prosecution history at the Imperial County Jail, his subjective belief would not have established discriminatory prosecution.  United States v. Armstrong, 517 U.S 456, 465 (1996) (holding that in order to prevail on a discriminatory prosecution claim, a defendant must show a prosecutorial policy which had a discriminatory effect and was motivated by a discriminatory purpose); McCleskey v. Kemp, 481 U.S. 279, 292 (1987) (holding that a defendant "must prove that the decisionmakers in *his* case acted with discriminatory purpose.") (emphasis in original).

Even assuming Walker's testimony was relevant in regard to Petitioner's discriminatory prosecution claim or his political motivation argument, Walker actually testified that the Black inmates involved in assaults at the jail were treated unfairly because they were charged with misconduct but the Hispanic inmates were not.  (Lodgment No. 16, Reporter's Tr. at 1544-45.) To the extent Petitioner contends he could have correlated all Black/Hispanic assaults where an inmate was prosecuted, and shown that because each incident was videotaped there was no innocent explanation for the district attorney's decision to prosecute Black inmates more often than Hispanic inmates, he has, as set forth above, failed to identify any reason for his failure to obtain such evidence during pre-trial discovery, other than its lack of existence or his own inability to properly manage discovery procedures.  Petitioner has not identified any specific incident of misconduct by the trial court or the prosecutor in the voluminous record of pre-trial

1 discovery which affected his ability to obtain evidence regarding his discriminatory prosecution

2 or political motivation claims.

3       In his Traverse, Petitioner clarifies that his discriminatory prosecution claim was based

4 on the fact that he had been transferred to the Imperial County Jail for the purpose of being

5 prosecuted for assaults on prison guards which he allegedly committed while in prison.

6 (Traverse at 2.) He apparently contends the guards at the jail set up his assault on Cooper as a

7 result of political motivations driven either by retaliation for Petitioner having assaulted the

8 prison guards, or in response to Petitioner's attempt to expose the racial inequity in the decisions

9 by the jail administration to prosecute Black inmates disproportionately to Hispanic inmates.

10 (Id.) Although Petitioner contends his motion to dismiss the charges against him on this basis

11 was denied "arbitrarily" and "without honest or thorough consideration by the court" (id. at 3),

12 he identifies no specific facts which would support a finding that his motion to dismiss the

13 charges was improperly denied. Neither does he identify any specific example of bias or

14 interference with his ability to conduct discovery regarding this aspect of his discriminatory

15 prosecution defense.

16       Accordingly, the Court finds that Petitioner has failed to demonstrate a due process

17 violation resulting from the alleged manner in which the trial court limited his ability to conduct

18 his defense, commented at the trial regarding his evidence, or ruled on discovery motions or his

19 attempts to subpoena records. Ortiz-Sandoval, 81 F.3d at 897; Jammal, 926 F.2d at 919. The

20 state court's adjudication of claim three on the basis that Petitioner was not prejudiced by any

21 of the trial court's rulings or comments was therefore neither contrary to, nor involved an

22 unreasonable application of, clearly established federal law, and was not based on an

23 unreasonable determination of the facts. Williams, 529 U.S. at 404-07.

24 **E.**    **Petitioner is not entitled to habeas relief as to claim four.**

25       Petitioner contends in claim four that juror misconduct during deliberations demonstrates

26 actual bias requiring reversal of his conviction. (Pet. at 9-9a.) He claims that two of the jurors

27 were former correctional officers, and that one described the atmosphere of the jail to the other

28 jurors during deliberations while the other advised the jury how the control panels for the cell

doors worked.  (Id.)  Petitioner argues that these jurors lied during voir dire when they stated they could set aside their correctional officer experience and prior relationships with the prosecution's witnesses with whom they had worked before retiring, which infringed upon his right to challenge the jurors either for cause or by use of peremptory challenges.  (Id.)  Petitioner contends the misconduct established an actual bias, and that the appellate court erred in finding the misconduct harmless.  (Id.)  Respondent contends that the findings by the state appellate and trial courts that Petitioner was not prejudiced by the misconduct are neither contrary to, nor involved an unreasonable application of, clearly established federal law.  (Ans. Mem. at 21-22.)

The appellate court denied the claim, stating:

> We agree with Thompson that the juror statements referring to their correctional officer experience constituted the improper presentation of extrajudicial information to the jury during deliberations.  [Footnote: On appeal, the People argue that the jurors's statement regarding the inmates controlling the jail was an inadmissible statement of the juror's mental processes.  To the contrary, the statement does not describe the juror's reasoning underlying his vote, but provides information on the conditions at the jails.]  However, we conclude, as did the trial court, that there is no substantial likelihood of juror bias.  As noted by the trial court, there was no dispute that a correctional officer opened the cell door, and there was no controversy regarding whether the inmates had more control over the jail than did correctional officers.  The defense case was premised on the theory that correctional officers were intentionally creating opportunities for inmate assaults to occur.  A comment that inmates, not correctional officers, control the jails could actually benefit the defense by suggesting that the officers were compliant and acceded to inmate requests for opportunities to assault each other, thus adding legitimacy to Thompson's claimed fear of an assault by Cooper when a correctional officer opened his cell door.

> Thompson argues that reversal is required for juror bias because the correctional officer who stated his opinion about inmate control of the jails had represented during voir dire that he would not decide the case based on his experience as a correctional officer.  He posits that the statement during deliberations referencing his correctional officer experience reveals actual juror bias.  We are not persuaded.  When the issues of this particular case are examined, we are satisfied the comment shows no such bias.  As we stated, the comment had no particular relevance to the issues in the case and it could even be construed as beneficial to the defense to the extent it suggests Thompson had a legitimate fear of assault by an inmate.

> To the extent Thompson asserts that the correctional officer juror's description of how the door control panel worked constituted prejudicial misconduct, the argument is unavailing.  The trial court readily found this statement caused no prejudice.  We agree.  A mere description of how the control panel worked, standing on its own, does not provide any information inherently likely to have influenced a juror nor does it show a juror was actually biased against Thompson.

1
2
3
4
5

    Finally, the fact that Thompson initiated the attack against Cooper, under circumstances where Cooper was handcuffed and made no movements towards Thompson, provided strong evidence to defeat Thompson's claim of self-defense. (See *People v. Minifie, supra*, 13 Cal.4th at p. 1068; *In re Christian S.* (1994) 7 Cal.4th 768, 783 (danger must appear to be immediate and present to support self-defense).) The strength of the evidence against Thompson further shows there is no substantial likelihood that the jurors' statements referring to their correctional officer experience influenced the jury's vote.

6

(Lodgment No. 5, <u>People v. Thompson</u>, No. D044829, slip op. at 13-15.)

7        Petitioner has a Sixth Amendment right to trial by a jury in which the verdict is based on

8  evidence presented at the trial. <u>Turner v. Louisiana</u>, 379 U.S. 466, 472-73 (1965). This right

9  is implicated if a jury is "exposed to prejudicial extrinsic information . . . during jury

10  deliberation." <u>Mancuso v. Olivarez</u>, 292 F.3d 939, 949 (9th Cir. 2002); <u>Sassounian v. Roe</u>, 230

11  F.3d 1097, 1108 (9th Cir. 2000). In <u>United States v. Vasquez</u>, 597 F.2d 192 (9th Cir. 1979), the

12  Court, in a matter of first impression, announced that when extrinsic evidence is introduced in

13  the jury room, a defendant is entitled to a new trial "if there existed a reasonable possibility that

14  the extrinsic material could have affected the verdict." <u>Id.</u> at 193. The Court noted that a trial

15  judge has an obligation to determine the extent to which jurors saw or discussed extrinsic

16  evidence, but should not investigate the subjective effects on the jurors, and should reach the

17  determination whether there was a reasonable possibility of prejudice "without the benefit of

18  juror opinions which might negate or affirm a conclusion of actual harm." <u>Id.</u> at 194.

19        The <u>Vasquez</u> test was applied to review of state court judgments under section 2254 in

20  <u>Gibson v. Clanon</u>, 633 F.2d 851 (9th Cir. 1980), decided before AEDPA was enacted. The

21  <u>Gibson</u> Court recognized that although <u>Vasquez</u> involved a direct appeal of a federal district

22  court trial, and it was arguable that its holding had been predicated on federal court's supervisory

23  powers, the test for determining the effect of impermissibly considered evidence which is set

24  forth in <u>Vasquez</u> was in fact constitutionally compelled by Supreme Court authority set forth in

25  <u>Turner v. Louisiana</u>, 379 U.S. 466 (1965), <u>Parker v. Gladden</u>, 385 U.S. 363 (1966), <u>Sheppard</u>

26  <u>v. Maxwell</u>, 384 U.S. 333 (1966), <u>Estes v. Texas</u>, 381 U.S. 532 (1965) and <u>Irvin v. Dowd</u>, 366

27  U.S. 717 (1961). <u>See</u> <u>Gibson</u>, 633 F.2d at 854. The Court in <u>Gibson</u> also noted that the

28  "reasonable possibility" test of <u>Vasquez</u> "is equivalent in severity" to the harmless beyond a

reasonable doubt test of <u>Chapman v. California</u>, 386 U.S. 18, 24 (1967), which is typically applied by state trial courts to federal constitutional errors. <u>Gibson</u>, 633 F.2d at 853. The Court in <u>Gibson</u> concluded that the state trial judge should have applied the <u>Vasquez/Chapman</u> test to determine whether it could be concluded beyond a reasonable doubt the extrinsic material did not contribute to the verdict. <u>Id.</u> at 855. Although <u>Gibson</u> simply granted habeas relief once it found that the trial court had erred in that respect, subsequent Ninth Circuit authority mandates application of the harmless error test articulated in <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 623 (1993) after finding that a state court's adjudication of a claim was contrary to or involved an unreasonable application of <u>Chapman</u>. <u>Inthavong v. LaMarque</u>, 420 F.3d 1055, 1060-61 (9th Cir. 2005), <u>cert. denied</u>, 126 S.Ct. 1660 (2006).

The Court is compelled by Ninth Circuit authority to apply clearly established federal law as set forth in <u>Gibson</u>. <u>See</u> <u>LaJoie v. Thompson</u>, 217 F.3d 663, 669 n.6 (9th Cir. 2000) (noting that Ninth Circuit cases may be persuasive authority for purposes of determining what law is "clearly established."); <u>see also</u> <u>Mancuso</u>, 292 F.3d at 949-50 (applying clearly established federal law under AEDPA as found in <u>Gibson</u> and <u>Brecht</u> to a claim that a juror tampered with trial exhibit to discover defendant had a prior conviction); <u>Sassounian</u>, 230 F.3d at 1108-11 (same with respect to jury discussion of a telephone call which the jury became aware of when overhearing the sidebar where it was ruled inadmissible). However, even if Petitioner can demonstrate that the state court's determination that the error here was harmless is objectively unreasonable under clearly established federal law as set forth in <u>Gibson</u>, habeas relief is not available unless Petitioner can also demonstrate that the statements of the jurors had a substantial or injurious effect or influence on the jury's verdict. <u>Sassounian</u>, 230 F.3d at 1108 (holding that harmless error standard of <u>Brecht</u> applies to claims of jury's consideration of extraneous evidence).

Petitioner presented the declaration of four jurors in support of his motion for a new trial. (Lodgment No. 1, Clerk's Tr. at 554-57.) Three of those jurors stated that they and "the vast majority" of the other jurors believed that the guards intentionally opened Petitioner's cell door in order to permit the assault to occur. (<u>Id.</u>) They also stated that one of the jurors had described

how the control panel for the cell doors worked.  (<u>Id.</u>)  The fourth juror, one of the former correctional officers, stated that he "advised the jury how the control door panels worked based on my experience as a correctional officer." (<u>Id.</u> at 555.)  He also stated that he believed the jail authorities "were at least negligent" in the handling of the incident.  (<u>Id.</u>)

The appellate court found that: "A mere description of how the control panel worked, standing on its own, does not provide any information inherently likely to have influenced a juror nor does it show a juror was actually biased against Thompson." (Lodgment No. 5, <u>People v. Thompson</u>, No. D044829, slip op. at 14.)  The appellate court also found that the statement regarding the inmates controlling the jail "could actually benefit the defense by suggesting that the officers were compliant and acceded to inmate requests for opportunities to assault each other, thus adding legitimacy to Thompson's claimed fear of an assault by Cooper when a correctional officer opened his cell door." (<u>Id.</u>)  The declarations of the jurors support these findings as they indicate that the vast majority of the jurors believed that the guards intentionally opened cell doors in order to facilitate assaults within the jail.  However, consistent with the controlling federal law discussed above, neither the trial nor appellate court actually relied on the jurors' subjective opinions in finding no prejudice, and neither does this Court.

Petitioner has failed to show that the state court's finding of no prejudice was objectively unreasonable.  His defense was based on the theory that he acted in self-defense in attacking Cooper, or was entrapped, because he believed the guards were setting him up to be assaulted by Cooper.  As discussed above with respect to claim three, Petitioner presented strong evidence in support of his contention that the guards intentionally allowed the assaults to occur.  His defense, however, was not dependant on the determination whether the cell doors were opened accidentally or intentionally.  His defense was dependant on the reasonableness of his belief that his actions were necessary to protect himself.  As the appellate court found, the jury rejected the defense due to the fact that Petitioner initiated the attack against a handcuffed Cooper who was merely defending himself and was not being aggressive.  As set forth above, additional evidence supported a finding that Petitioner was not acting in self defense.  This included testimony by Petitioner and his expert witness that Petitioner had a duty to carry out retaliatory assaults on

rival gang members, that Petitioner would have been perceived to be weak and a coward if he didn't attack Cooper, and that one of the reasons he attacked Cooper was the disrespect shown when Cooper was moved to a cell with a better view of the dayroom television. (Lodgment No. 16, Reporter's Tr. at 1714-19, 1770-71, 1780-82, 1810.)

Thus, even to the extent the jurors committed misconduct by introducing extrinsic evidence into the jury deliberations regarding how the panel which opened the cell doors worked, and/or regarding the general nature of the jail environment, Petitioner has not demonstrated that the state court's finding of no prejudice was contrary to, or involved an unreasonable application of, clearly established federal law, or was based on an unreasonable determination of the facts. Even assuming Petitioner could make such a showing, he has failed to demonstrate that he is entitled to habeas relief in this Court, because he has not shown the misconduct had either a substantial or injurious effect or influence on the jury's verdict. LaMarque, 420 F.3d at 1060-61.

Finally, Petitioner contends that the two former correctional officer jurors were biased against him, and that their bias is evident by the fact that they lied during voir dire when they said they could and would set aside their correctional officer experience and decide the case solely on the evidence presented at trial. (Pet. at 9-9a.) Petitioner also contends the jurors' dishonesty deprived him of his ability to challenge those jurors for cause, or though use of a peremptory challenge. (Id.)

The Ninth Circuit has noted that:

"In most situations, void dire, 'the method we have relied on since the beginning,' should suffice to identify juror bias." [Tinsley v. Borg, 895 F.2d 520 (9th Cir. 1990)] at 528 (quoting Patton v. Yount, 467 U.S. 1025, 1038, 104 S.Ct. 2885, 81 L.Ed.2d 847 (1984)). This is because truthful disclosure of information during voir dire sets up a challenge for cause (or in less clear-cut cases, a peremptory challenge) that can be exercised before resources are devoted to trying the case to verdict. Cause challenges lie for implied (or presumed) bias as well as for actual bias. See [United States v.] Gonzalez, 214 F.3d [1109 (9th Cir. 2000)] at 1111. Honesty is the heart of the jury-selection process in an adversarial system; indeed, "voir dire" means "to speak the truth." The whole point of the voir dire process is to elicit information from the venire that may shed light on bias, prejudice, interest in the outcome, competence, and the like so that counsel and the parties may exercise their judgment about whom to seat and whom to challenge. [Footnote omitted] Accordingly, when the issue of bias arises after trial (as it did in McDonough and Tinsley) or, as here, on collateral review of a conviction in state court, dishonesty in voir dire is a critical factor. As

1  *McDonough* indicates, "it ill serves the important end of finality" to wipe the slate
2  clean when the potentially disqualifying relationship is disclosed on voir dire
   examination.  464 U.S. at 555, 104 S.Ct. 845.

3  <u>Fields v. Brown</u>, 431 F.3d 1186, 1196-97 (9th Cir. 2005)

4      Here, as in <u>Fields</u>, the potential for bias was revealed on voir dire when the two jurors
5  honestly answered that they were former correctional officers.  Accepting Petitioner's contention
6  that they must have lied when they stated they could and would set aside their experience
7  because they eventually did not do so, would, as <u>Fields</u> noted, "ill serve 'the important end of
8  finality' given the state court judgment."  <u>Id.</u> at 1197 (quoting <u>McDonough</u>, 464 U.S. at 555.)
9  Petitioner has not demonstrated that the jurors were dishonest during voir dire or biased against
10 him.  The state court's determination that the jurors' statements did not reveal a bias against
11 Petitioner is objectively reasonable, and Petitioner is not entitled to habeas relief.  <u>See</u> <u>Early v.</u>
12 <u>Packer</u>, 537 U.S. 3, 10 (2002) (stating that despite the existence of other reasonable conclusions,
13 where, "it is at least reasonable to conclude that [the state court's conclusion was reasonable]
14 . . . the state court's determination to that effect must stand.")  In any case, it cannot be said that
15 the state court's finding in this regard is objectively unreasonable.  <u>Andrade</u>, 538 U.S. at 75-76
16 ("[A] federal habeas court may not issue the writ simply because the court concludes in its
17 independent judgment that the relevant state-court decision applied clearly established federal
18 law erroneously or incorrectly. . . . Rather, that application must be objectively unreasonable.").
19 The Court therefore recommends that habeas relief be denied as to claim four.

20                                      **VI.**

21                      **<u>CONCLUSION AND RECOMMENDATION</u>**

22     For all of the foregoing reasons, **IT IS HEREBY RECOMMENDED** that the Court
23 issue an Order: (1) approving and adopting this Report and Recommendation; and (2) directing
24 that Judgment be entered denying the Petition.

25     **IT IS ORDERED** that no later than ***April 20, 2007*** any party to this action may file
26 written objections with the Court and serve a copy on all parties.  The document should be
27 captioned "Objections to Report and Recommendation."

28 / / /

1     **IT IS FURTHER ORDERED** that any reply to the objections shall be filed with the

2   Court and served on all parties no later than ***May 2, 2007***.  The parties are advised that

3   failure to file objections with the specified time may waive the right to raise those objections on

4   appeal of the Court's order.  <u>See</u> <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez</u>

5   <u>v. Ylst</u>, 951 F.2d 1153, 1156 (9th Cir. 1991).

6     **IT IS SO ORDERED**.

7   DATED:  March 21, 2007

8

9                                                            Hon. Nita L. Stormes
                                                            U.S. Magistrate Judge
10

11

12   CC:      HON. JOHN A. HOUSTON
                  ALL PARTIES
13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28